STATEMENT OF FACTS.
This suit was brought by appellant company, real estate brokers, to recover from defendant, Alfred G. Kahn, a commission claimed to be due under a contract between the parties for the sale of certain real estate, it being alleged that they had in fact procured the purchaser, and that defendant sold the property in violation of his contract giving them the exclusive right to make sale.
On May 23, 1924, appellant wrote appellee a letter as follows:
"Little Rock, Ark., May 23, 1924.
"Mr. Alfred Kahn, Kahn Bldg., Little Rock, Ark.
"Dear sir: Referring to conversation with you a few days ago, will you kindly give us exclusive sale of the 75 feet of ground on Broadway, between 17th and 18th? We have a number of parties interested in buying a location for a home on Broadway, Arch or Gaines, and it is possible we might interest them in this home-site of yours.
 "Yours very truly, "Polk-Bourne Real Estate Co. "By R. W. Polk."
"RWP-LS
Appellee wrote the word "Yes" on the bottom of the letter in ink, and his initials, "A. G. K.," and returned *Page 594 
it to the company. Appellant wrote him again on May 28, 1924, as follows:
"Little Rock, Ark., May 28, 1924.
"Mr. Alfred G. Kahn, Kahn Bldg., Little Rock, Arkansas.
"Dear sir: We thank you for your indorsement on our letter of May 23, stating you would give us an exclusive sale on the property on Broadway between 17th and 18th. You did not put a price on the property in your letter, but some time ago you gave us a price on this of $7,500.
 "Yours very truly, "Polk-Bourne Real Estate Co. "By R. W. Polk." "rwp-ls"
Appellee indorsed on the bottom of this letter in ink, "$7,500 is right. A. G. K.," and returned it to appellant.
Appellant company then wrote some letters on June 21 and June 26 to the officers of the Ku Klux Klan, suggesting that the 75 feet of ground, upon which there was a good garage with servants' room above, should be purchased at the specified price by the Women's Klan for use in connection with the property on the corner, which it adjoined, already purchased by the organization, and which had no garage and servants' room.
Mr. Polk, of appellant company, also testified he had talked with Miss Gill, of said organization, about the sale of the property three or four days before he found out it had been sold, and that he had had a telephone conversation with defendant, who also asked: "Why don't you sell that to the organization you belong to?" and he had laughed and replied, "That those were the people he was figuring with, and that he expected an answer in a day or two." He didn't find out about the sale until several days after it was made, when he saw some workmen around the garage on the property. He also stated that a reasonable time for a real estate agency selling contract to run would be sixty days, and that a reasonable commission for the sale of such property would be five per cent. *Page 595 
Butler, a real estate agent of twenty years' standing, also stated that a reasonable time for the sale of the property would be ninety days, and that he would try to get six months; that five per cent. would be a reasonable commission; that that was the commission established by the real estate bureau and customary in this vicinity.
W. S. Holt testified that he was in the real estate and loan business; had sold Mr. Comer the place adjoining on the corner, and that Mr. Comer was interested in the Kahn property at the time that deal was closed, about the 17th of June; that about two weeks were consumed in making the sale; that he had talked with Mr. Comer about the Kahn property, telling him he thought it would be a good idea for them (Women of the Ku Klux Klan) to buy the Kahn property. In a few days after the trade for the corner property was closed, Comer asked him to see what he could get the Kahn property for, and he called Mr. Kahn to his office and made him an offer of $7,000, which he would not accept, but stated he would accept $7,500, and on that basis the trade was closed. He thought this was about the first of July; that he had a conversation about the Kahn property with Comer some time before June 17, and thought he was interested, as he said, "We will get this closed up first, and then see." He was representing Mr. Comer at the time he called Mr. Kahn, and Mr. Kahn paid the commission to him. He didn't talk to Mar. Kahn until about the first of July. He asked him for a ten days' exclusive contract for the sale, but he would not grant it, saying "that he was about to make a sale himself."
James A. Comer testified he wanted to purchase a piece of property for the women of the Ku Klux Klan, and called in W. S. Holt to aid him. He looked at the house on the corner, and, at the time, told Mr. Holt to see if the Kahn lot could be purchased, and at what price. He first saw this property with a view to its possible purchase in negotiating for the purchase of the building on the corner; was not shown the property by any real estate dealer, and would not have bought the corner house if he *Page 596 
had not been assured that this was for sale, and in dealing with the Kahn property Mr. Holt was acting for him. He told Holt he would give $7,500 for the property, no more; that if he had any commission it would have to come out of that. He made a flat offer of $7,500, which Mr. Holt reported was accepted, and details of closing the deal were started. He would not buy any property in Little Rock without consulting Mr. Holt.
He had the conversation with Mr. R. W. Polk about the property before it was purchased, but Mr. Polk did not in any way influence or induce him to buy it; said Miss Bobby Gill was the supreme national officer of the Women of the Ku Klux Klan.
She stated in her deposition that she had asked Mr. Comer to purchase the property for her if he could get it, and he acted for the Women of the Klan at her request. Her attention was called to this property at the time she was inspecting the residence on the corner lot. No real estate dealer had anything to do with calling her attention to it. Mr. Comer attended to all details in buying the property. Mr. Polk either wrote her a letter or called her while she was out of town. He came to her office and told her something about the property.
The defendant testified Mr. Holt telephoned him on June 24, asking if the property was for sale, and he told him it was. He said he was representing Judge Comer for the Ladies of the Ku Klux Klan, who had just bought the house on the corner, and "that Judge Comer was his close personal friend, and made his real estate purchases through him." Two or three days later he came back and said Judge Comer was willing to pay $7,500 if the commission could be deducted. He told Mr. Holt it could be, and the deal was closed on that basis. He did not consult Mr. Polk, because "he had no contract with Mr. Polk." He knew about the letters, but had made no contract, unless the letters were a contract. He did not have the property listed with any other real estate dealers. Herman Kahn owned the one lot and the defendant owned the half lot. Mr. Holt called him about the *Page 597 
property somewhere the last of June, and he called Mr. Polk about it somewhere around that time, he thought before.
The case was tried before the court, a jury being waived. The court made the following findings of fact at appellants' request:
"The court finds that defendant sold said property or caused said property to be sold to the Women of the Ku Klux Klan for said price of $7,500, said property being conveyed to said purchaser by deed executed July 10, 1924.
"The court finds that defendant has not paid plaintiff any commission on the sale of said property." And refused to make other findings, and refused to declare it a matter of law that the letters between the parties constituted a contract giving "the exclusive right of sale of said property for a reasonable time, and that a reasonable time, under the circumstances, would be ninety days, and that, under the terms of said contract, if plaintiff had sold said property for defendant during said ninety days, it would have been entitled to receive from the defendant a commission of five per cent. of the purchase price." And also that defendant had the right to breach the contract without notice so long as the breach of same was made in good faith, but finds that he did not act in good faith, in the absence of which he had no right to breach the contract; that plaintiff had a right to recover a five per cent. commission on the sale price.
The court made the following findings of fact at appellee's request:
"The court finds that the sale of lot 3 and the south half of lot 2, block 203, in the city of Little Rock, to the Women of the Ku Klux Klan was made by the defendant directly to the purchaser.
"The court finds that, in making the sale, the defendant acted in good faith, even though it had developed that he had an exclusive contract with the plaintiff, containing no time limit. *Page 598 
"The court finds that the defendant did not place the property in the hands of any other real estate dealer, and that he sold the property personally and not through any agent in his employ.
"The court finds that the plaintiff was not the procuring or inducing cause of the sale of the property in controversy;" and declared the law, at his request, that no contract was entered into between the parties.
"The court finds that, if there were a contract entered into between the plaintiff and defendant, the same did not deprive the defendant personally of the right to make sale of the real estate in question, without liability for commission, provided he acted in good faith and without having placed the lands in the hands, of any agent or broker, other than plaintiff, for the purpose of sale."
The court stated, on his own motion, that he did not think the two letters with the notations constituted final contract, or that any outside evidence could be admitted to determine whether or not there was a written contract, leaving the impression on him that there was something final to be done afterwards; that, even if there was an exclusive contract, the owner had the right to make sale direct, and entered judgment for the defendant, from which this appeal is prosecuted.
(after stating the facts). The great weight of the testimony shows that the sale of the property was effected by the owner upon negotiations begun by the representative of the purchaser; also it is true that appellee finally consented to a reduction of the price in an amount equal to the usual agent's selling commission in order to make the sale; that appellee had not given any other agent than appellant, if its letters with his notations constituted an exclusive contract for selling, authority to make sale, and the court also found expressly that the appellee acted in good faith in making the sale himself, and its finding on contradictory testimony is conclusive. *Page 599 
Conceding that the letters between the parties, with the notations thereon, constituted an exclusive contract authorizing the sale of the property by appellant company, there was no time limit specified therein, nor can such contract be construed an exclusive one to make such sale, within a reasonable time, at the usual and customary commission, and could not deprive the owner of the right to make the sale without liability for payment of commission, while acting in good faith. In Harris White v. Stone, 137 Ark. 23, this court said:
"In the present case the contract did not contain a time limit within which the agent might make a sale of the property, and there was an implied reservation of right of the owner to sell the land himself, free from any liability for commissions, provided he acted in good faith towards his agent. The contract, not specifying any exact period of time within which the agent was to have the exclusive right to sell, does not deprive the principal of the right to sell the land himself when he acts in good "faith towards his agent."
The giving exclusive authority under the circumstances to appellant to sell, without a time limit as to when the sale should be completed, merely prevented the placing of the property for sale in the hands of other agents, but not the sale of the property by the owner himself, while acting in good faith towards his agent.
The testimony amply sustains the findings and judgment, which is in all things affirmed.